509 F.Supp. 1300 (1980)
UNITED TRANSPORTATION UNION, Plaintiff,
v.
LONG ISLAND RAIL ROAD AND METROPOLITAN TRANSPORTATION ASSOCIATION, Defendants.
No. 79 C 3118.
United States District Court, E. D. New York.
March 5, 1980.
*1301 Highsaw, Mahoney & Friedman, P. C., Washington, D. C., Edward D. Friedman, Washington, D. C., of counsel, Shapiro, Shiff, Beilly, Rosenberg & Fox, New York City, Sidney Fox, New York City, of counsel, for plaintiff United Transp. Union, and amicus curiae Broth. of Locomotive Engineers, Railroad Yard Masters of America, Broth. of Railway Signalmen, Brotherhood of Railway Carmen, Intern. Ass'n of Machinists, and Broth. of Railroad and Airline Clerks.
Thomas M. Taranto, Jamaica, N. Y., for defendant Long Island Railroad; Seward & Kissel, New York City, of counsel.
Seward & Kissel, New York City, for defendant Metropolitan Transp. Authority; Eugene P. Souther and Anthony R. Mansfield, New York City, of counsel.

*1302 Memorandum of Decision

MISHLER, Chief Judge.
This action arises within the context of a labor controversy between those employees of the Long Island Rail Road (the "Railroad") whose exclusive bargaining representative is the United Transportation Union (the "UTU"), and the Railroad and its parent agency, the Metropolitan Transportation Authority (the "MTA"). On December 6, 1979, as the parties were on the verge of exhausting the collective bargaining procedures mandated by the Railway Labor Act, 45 U.S.C. §§ 151 et seq., (the "Act"), the UTU filed this suit seeking: (a) a declaratory judgment that the relationship between the parties was governed by the Act and that the employees could thus not be subjected to the sanctions of Sections 200 to 214 of the New York Civil Service Law (the "Taylor Law") in the event they engaged in the "self-help" authorized by the Act; and (b) injunctive relief to protect those rights of the employees guaranteed by the Act, including an injunction against the commencement or prosecution of a state court action seeking to invoke the Taylor Law. On December 8, 1979 the UTU employees went on strike. On December 14, 1979, President Carter established an Emergency Board pursuant to section 10 of the Act, 45 U.S.C. § 160, and the employees returned to work. The "cooling off" period triggered by the Presidential action was to expire on February 14, 1980.
On January 17, 1980 the defendants took their first action in this suit, filing a motion to dismiss in which they claimed that no justiciable case or controversy existed since they did not believe that the Taylor Law could be invoked against the UTU's members and thus had no intent of invoking its sanctions. According to the defendants, while the Railroad was a subsidiary corporation of the MTA, it was not a "public benefit subsidiary corporation," and thus, as a matter of state law, its employees were not "public employees" subject to the Taylor Law. See N.Y. Public Authorities Law § 1265(9)(a); N.Y. Civil Service Law § 201(7)(A).
On February 8th, however, before the motion to dismiss could be heard, the defendants changed their posture completely by converting the Railroad from a private stock corporation to a public benefit corporation whose employees would be facially subject to the Taylor Law. On February 12th, the UTU responded by moving for a temporary restraining order and injunctive relief preliminarily restraining the defendants from commencing a state court action grounded on the Taylor Law to enjoin a strike by the UTU's members. The undersigned denied the motion on the record. At that time, because the parties appeared to agree that all pertinent facts were a matter of record, the court suggested that they expeditiously attempt to arrive at an agreed statement of facts so that the case might be speedily decided. The suggestion, however, was not followed.
Instead, on February 13th  two days before the expiration of the "cooling-off" periodthe Railroad, by order to show cause, commenced suit against the UTU and other unions in Supreme Court, New York County, seeking an injunction under the Taylor Law against the impending strike. Long Island Rail Road Co. v. United Transportation Union, et al., 484 F.Supp. 1290 (Sup.Ct. N.Y.Co.). Justice Peggy Bernheim issued a temporary restraining order and set down a hearing on the Railroad's motion for a preliminary injunction for February 15th. On February 14th, the unions removed that action to the United States District Court for the Southern District of New York, and moved to have the action transferred to this court and consolidated with the instant action. Long Island Rail Road Co. v. United Transportation Union, et al., 103 Misc.2d 220, 425 N.Y.S.2d 518 (S.D.N.Y.). The Railroad moved to remand the state action. With the consent of the parties, the temporary injunction against the strike was continued while Chief Judge MacMahon considered the motions.
On February 21st, the defendants filed their answer in the instant action. As is pertinent here, paragraph four of the answer admits the allegation in paragraph *1303 four of the complaint that the Railroad "interchanges freight with railroads engaged in interstate commerce."[1] However, it denies the remaining allegations of that paragraph, including the averments that the Railroad "is a Class I railroad engaged in business as a common carrier for hire in the transportation of passengers and property in interstate and foreign commerce ... and is a `carrier' within the meaning of that term as defined in the Railway Labor Act." The answer further affirmatively alleges that the Railroad is a public benefit corporation engaged "essentially [in] intrastate commuter service" (¶ 18) and that its employees are governed by the Taylor Law rather than the Act.
On February 25th, Chief Judge MacMahon, in a written opinion, granted the Railroad's motion to remand the action before him to the state court. On February 27th, the unions moved before Justice Sidney Leviss in Supreme Court, Queens County, to transfer the state action from New York County to Queens. Justice Leviss continued the temporary restraining order against the union's threatened strike and directed that the Railroad refrain from seeking a preliminary injunction in New York County pending his decision on the venue motion.[2]
Finally, on February 28th, the plaintiff in the instant action sought and obtained from the undersigned an order to show cause bringing on the summary judgment motion which is the subject of this opinion. Argument was heard on March 4th.[3] At the conclusion of the argument the court granted the relief which we will outline below and advised the parties that this written opinion would be issued shortly. A copy of the judgment which was entered on March 4th pursuant to the court's oral opinion is appended hereto.

The Issues
There are three major issues confronting us:
(1) Is the Railroad a "carrier" subject to the Act;
(2) If so, does the Act preempt the application of the Taylor Law to the Railroad's employees;
(3) If the Taylor Law may not be applied to bar a strike by the plaintiff's members, what is the appropriate relief.

Discussion
A. As the defendants conceded both at the February 12th oral argument on plaintiff's motion for a preliminary injunction and at argument on the instant motion, the only major issue which requires a factual finding is the first of those we itemized, i. e., whether the Railroad is a "carrier" within the meaning of the Act, 45 U.S.C. § 1. More specifically, the defendants contend that a factual issue exists as to whether the Railroad is engaged in or has a sufficient impact on interstate transportation to fall within the Act's regulatory scheme. The existence of this question of fact they assert, precludes the grant of summary judgment. We disagree.
The court's function on a motion for summary judgment is to determine whether any material factual issues are in dispute. Adickes v. S. H. Kress & Co., 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). The burden is on the moving party to establish that the material facts are either conceded, undisputed, or beyond dispute. See Heyman v. Commerce & Industry Ins. Co., 524 F.2d 1317, 1319 (2d Cir. 1975). And, "the mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation *1304 by the moving party." Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438 at 445 (2d Cir. 1980) (emphasis in original). The plaintiff has made such a convincing demonstration here.
The plaintiff has submitted documentation clearly establishing that the Railroad is the only common carrier by rail serving the numerous industries and traveling public in the Counties of Nassau and Suffolk. It has submitted reports filed by the Railroad with the ICC indicating that the Railroad's revenues from its freight operations exceeded $18 million in the year ending December 31, 1978. These revenues were obtained as a result of providing freight service to numerous Long Island concerns, such as aircraft manufacturers, supermarket chains, building suppliers, food processors, and farms. Furthermore, while the Railroad's own physical operations are located solely within New York State, its freight service supplies a critical link in the transportation of goods both to and from points throughout the continental United States and Canada. This is clearly evidenced by the fact that the Railroad interchanges freight with more than a dozen other railroads which are interstate carriers. According to the plaintiff, the Railroad presently handles approximately 1,000 freight cars per week to consignors and consignees over its tracks.
The defendants, in response, do not seriously dispute most of these factual allegations. Indeed, they admit that the Railroad does interchange freight with other carriers going in and out of New York State. They argue, however, that the Railroad's freight revenues and operations are miniscule when compared to the scale of its intrastate commuter operations, and that as such, it should not be considered an interstate carrier. We reject this contention.
According to the defendants' own affidavits, the Railroad's revenues from freight operations in 1979 were, at a minimum, in excess of $12.1 million. Affidavit of James B. Huff, Controller of Metropolitan Transportation Authority, ¶ 9. These affidavits also contain claims that in 1978 the Railroad operated over 4,400 freight train trips, involving approximately 41,000 freight cars, or 800 cars per week. While these figures are slightly lower than those submitted by the plaintiff, the differences are not material for our present purposes. Nor, in the face of these figures do we find material the fact that the Railroad's freight revenues have decreased steadily over the years and that they now provide a small fraction of the Railroad's total income. Indeed, these figures, rather than undermining the plaintiff's characterization of the Railroad as an entity affecting interstate commerce, provide substantial support for the conclusion that the Railroad "is a necessary physical link with other railroads in the movement of a heavy volume of interstate rail freight via the New York City gateway between Long Island and other parts of the United States." Long Island R.R. Co. v. Brotherhood of R.R. Trainmen, 185 F.Supp. 356, 357 (E.D.N.Y.1960). In short, were we to consider nothing more than the defendants' own papers we would be compelled to conclude that the Railroad is engaged in "interstate transportation," and thus subject to the Act. State v. Taylor, 353 U.S. 553, 561, 77 S.Ct. 1037, 1042, 1 L.Ed.2d 1034 (1957). See United States v. Union Stock Yard & Transportation Co., 226 U.S. 286, 304, 33 S.Ct. 83, 88, 57 L.Ed. 226 (1912) ("That the service is performed wholly in one state can make no difference if it is a part of interstate carriage.").
We note, however, that in addition, the Railroad has historically considered itself as a "carrier" within the meaning of the Act, the Interstate Commerce Act, 49 U.S.C. §§ 1 et seq., and related statutes. Thus, it has consistently filed reports required by the Interstate Commerce Act with the ICC. In addition, its employees have consistently received the benefits of the Railroad Retirement Act, the Railroad Unemployment Insurance Act, and the Federal Employees Liability Act. Moreover, in the dispute which lies at the heart of this action, the Railroad has affirmatively sought to invoke the collective bargaining and mediation procedures set out in the *1305 Act, including the establishment of a Presidential Emergency Board. We do not believe that the Railroad can now unilaterally change its essential character within this context by the simple expedient of reorganizing its corporate structure under state law.
Finally, we think it relevant to point out that both the Emergency Board convened in this dispute, and the ICC in a recent decision dealing with another subsidiary of the MTA, Brotherhood of Locomotive Engineers v. Staten Island Rapid Transit Operating Auth., Finance Docket No. 29011 (Nov. 8, 1979), stated that the Railroad is a carrier subject to the Act.
Against this background we are convinced that no fact question exists as to the interstate character of the Railroad's operations. We find that the Railroad is a carrier within the meaning of the Act.
B. Having found that the Railroad is a carrier within the meaning of the Act we must next determine whether its employees are free to resort to the self-help permitted by the Act or are subject to the prohibition and penalties of the Taylor Law. Resolution of this issue turns upon whether the federal scheme established by the Act preempts the state from regulating the strike activities of the Railroad's employees. We believe that it does.
While the issue is of extreme importance, we do not think that it would serve any useful purpose to embark on a lengthy discussion of the relationship between the pertinent federal and state legislation. We have only recently dealt with the identical issue in a remarkably analogous context. In Brotherhood of Locomotive Engineers v. Staten Island Rapid Transit Operating Authority, No. 78 C 2083 (E.D.N.Y. February 9, 1979), we were asked to decide whether the Taylor Law could be applied to employees of another MTA subsidiary, the Staten Island Rapid Transit Operating Authority ("SIRTOA"). We held that if SIRTOA was subject to the Act its employees were free to engage in strike activities notwithstanding the fact that SIRTOA was a public benefit corporation whose employees were therefore subject to the Taylor Law's proscription of such conduct.
In reaching this result we held first that as a general matter, under the Supreme Court's holding in Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969), employees covered by the Act could not be prevented by the state from exercising their federally protected right to strike upon exhaustion of the Act's mandatory bargaining and mediation procedures notwithstanding the fact that a strike might result in substantial inconvenience or hardship to the public:
[T]he exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes. The disputants' positions in the course of negotiation and mediation, and their willingness to submit to binding arbitration or abide by the recommendations of a presidential commission would be seriously affected by the knowledge that after the procedures were exhausted a State would, say, prohibit the employees from striking or prevent the railroad from taking measures necessary to continue operating in the face of a strike.
. . . .
Whether the source of this right be found in a particular provision of the Railway Labor Act or in the scheme as a whole, it is integral to the Act. State courts may not enjoin a peaceful strike by covered railway employees, no matter how economically harmful the consequences may be.
Id. at 380-85, 89 S.Ct. at 1116-19.
We then held that under State of California v. Taylor, supra, 353 U.S. at 563-65, 77 S.Ct. at 1043-44, the right to strike was not impaired by the fact that the employer was a state agency:
Congress apparently did not discuss the applicability of the Railway Labor Act to a state-owned railroad. [However,] [t]he fact that Congress chose to phrase the coverage of the Act in all-embracing *1306 terms indicates that state railroads were included within it ....
.... When Congress wished to exclude state employees [from coverage under federal labor legislation] it expressly so provided. Its failure to do likewise in the Railway Labor Act indicates a purpose not to exclude state employees.
See also Parden v. Terminal Railway, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); International Longshoremen's Assoc. v. North Carolina State Ports Auth., 463 F.2d 1 (4th Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 245 (1972).[4]
Next, we held in SIRTOA that the tangential relationship between the carrier's activities and interstate commerce did not justify application of the Taylor Law. We noted that there was no legal basis for balancing the local interest against the federal interest in determining whether the Act or the state's legislation applied. "Not a single authority has been cited to this court which even suggests that we should engage in a quantitative analysis, debilitating the Act in some proportionate measure as the connection with interstate commerce decreases." Slip op. at 25.
Finally, we concluded that "New York State may not validly apply its Taylor Law to the employees of SIRTOA. Such abridgement of the right to strike, even when the affected employees are public servants, is a direct assault upon the heart of the federal scheme of labor relations in the railway industry. Under the Supremacy Clause of our Constitution, it is unquestionable that the federal scheme predominates." Slip op. at 26.
What this court said in SIRTOA applies with equal force in the present case. We find that employees of the Railroad, who have exhausted the mandatory bargaining and mediation procedures outlined in the Act, have a federally guaranteed right to strike.
C. From the foregoing, we think it clear that the plaintiff is entitled to a declaratory judgment that its members have the right to engage in self-help under the provisions of the Act and that the Taylor Law may not be invoked in derogation of this right. Moreover, we believe that the plaintiff is also entitled to a permanent injunction restraining the defendants from further prosecuting the state court action based on the Taylor Law. While we reach this latter conclusion with some hesitation we believe that the particular circumstances before us warrant the grant of such relief.
It is of course well-established that a federal court may enjoin a pending state court proceeding only where such an injunction is specifically permitted under one of the express exceptions to the Anti-Injunction Act, 28 U.S.C. § 2283.[5]See e. g., *1307 Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 630, 97 S.Ct. 2881, 2887, 53 L.Ed.2d 1009 (1977). It is clear, however, from the very language of § 2283 that a federal court has the authority to issue an injunction "to protect or effectuate its judgments."
Thus, the courts have held that an injunction may properly issue for the purpose of preventing relitigation in the state court of a matter which has been finally determined by a judgment in the federal forum. See, e. g., Mitchum v. Foster, 407 U.S. 225, 235-36, 92 S.Ct. 2151, 2158-59, 32 L.Ed.2d 705 (1972); Samuel C. Ennis & Co., Inc. v. Woodmar, 542 F.2d 45, 49 (7th Cir. 1976), cert. denied, 429 U.S. 1096, 97 S.Ct. 1112, 51 L.Ed.2d 543 (1977); International Assoc. of Machinists v. Nix, 512 F.2d 125, 130 (5th Cir. 1975); Donelon v. New Orleans Terminal Co., 474 F.2d 1108 (5th Cir.), cert. denied, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973); Complaint of Cosmopolitan Shipping Co., S.A., 453 F.Supp. 268 (S.D.N. Y.1978); Walter E. Heller & Co., Inc. v. Cox, 379 F.Supp. 299 (S.D.N.Y.1974). The rationale for permitting injunctions in such instances was stated by the Fifth Circuit in Woods Exploration & Producing Co. v. Aluminum Co. of America, 438 F.2d 1286, 1312 (5th Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972): "This [exception to § 2283] is a sensible solution to the problem of relitigation of federal decisions. It prevents multiple litigation of the same cause of action and it assures the winner in a federal court that he will not be deprived of the fruits of his victory by a later contrary state judgment which the Supreme Court may or may not decide to review."
Other cases have sustained the propriety of issuing an injunction against state court proceedings under the "protect or effectuate" exception to § 2283 where the state court action, while not involving matters identical to those litigated in the federal court, nonetheless threaten to nullify the vitality of the federal judgment. See e. g., United Industrial Workers of the Seafarers Int'l. Union v. Board of Trustees of Galveston Wharves, 400 F.2d 320 (5th Cir. 1968), cert. denied, 395 U.S. 905, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); N.L.R.B. v. Schertzer, 360 F.2d 152 (2d Cir. 1966); Sperry Rand Corp. v. Rothlein, 288 F.2d 245 (2d Cir. 1961). Thus, we think it clear that § 2283 does not present an absolute bar to our issuing an injunction that is necessary to assure that our declaratory relief will be effective.
However, the fact that a federal court has the power to enjoin state proceedings in order to protect its own judgment does not mean that it is appropriate to exercise that authority in every instance. Whether such an injunction should issue hinges upon consideration of a number of factors including "the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding." Mitchum v. Foster, supra, 407 U.S. at 243, 92 S.Ct. at 2162, 32 L.Ed.2d 705. While we have found no case which directly addresses the precise issue before us, there are several cases which point to the propriety of injunctive relief in circumstances such as these. Thus, in Donelon v. New Orleans Terminal Co., supra, the Fifth Circuit Court of Appeals affirmed the district court's grant of an injunction against local officials prosecuting a state court action in which they sought injunctive relief against allegedly unsafe practices of a railroad. The appellate court held that the injunction was properly issued by the district court in order to protect its own earlier final judgment holding that the railroad could not be subjected by local authorities to safety standards outside of the Federal Railroad Safety Act.
Even more analogous to the present situation is United Industrial Workers of the Seafarers Int'l. Union v. Board of Trustees of Galveston Wharves, supra. In that case a railroad carrier decided during the terms of the collective bargaining agreement with *1308 the plaintiff union to lease its facilities. This action would have resulted in the termination of its operation and its need for employees. The Union responded by requesting negotiation; when the carrier refused, it commenced a strike and picketing. The Union also commenced an action in federal district court seeking to enjoin the consummation of the carrier's lease agreement pending exhaustion of the Railway Labor Act's processes. The district court denied the requested relief and relegated the "minor dispute" to the Railroad Adjustment Board. On appeal, the circuit court reversed and held, inter alia, that because the dispute was a "major" one the carrier was required to negotiate in good faith with the Union. After further proceedings in the district court, a second appeal and remand, see United Industrial Workers of Seafarers Int'l. Union v. Board of Trustees of Galveston Wharves, 368 F.2d 412 (5th Cir. 1966), the district court ordered the Carrier to negotiate. It also enjoined the Carrier from "enforcing, giving continued effect to or availing [itself] in any manner whatsoever of the benefits of a state court injunction that [it had obtained] to enjoin the picketing by members of the Union." On appeal the Fifth Circuit Court of Appeals held that the injunction had been properly issued. The court found that the Union's picketing and strike were permitted under the federal act because the Carrier had refused to comply with its statutory duty to negotiate. Moreover, the court determined that "[t]he effect of the state court injunction against a possible Union strike [was] perhaps to render impotent the duty to bargain imposed by [the] Court." 400 F.2d at 331. The court concluded that
[t]he right to strike is adjunct to the Union's statutory rights and implicit in our [bargaining] order. This national labor policy cannot be frustrated by a state court injunction. To effectuate the judgment of the federal court, the district court properly enjoined the Carrier from availing itself of the state court injunction.
Id. at 334 (emphasis added).
Of course, these cases do not stand for the proposition that a federal district court may "enjoin state court proceedings merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law, even where the interference is unmistakably clear." Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 294, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970). However, these decisions do indicate that where a federal court has finally declared that a party does enjoy a protected right and the pending state judicial proceeding threatens to nullify the effect of the federal court's determination, an injunction may issue to prevent such a result. Moreover, we find support for this conclusion in the Supreme Court's decision in Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers, supra. There, in 1967, a railroad applied to a federal district court for an injunction which would restrain a union from picketing. The district court denied the requested relief. The railroad then sought and obtained the identical relief in a state court. Sometime thereafter the Supreme Court decided in Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., supra, as we noted above, that railway employees covered by the Railway Labor Act had a federally guaranteed right to engage in self-help activity such as picketing. Apparently in response to this decision, the union returned to federal district court and obtained an injunction against the enforcement of the state court's restraining order.
The Supreme Court found that the district court's action was barred by § 2283, rejecting inter alia, the union's contention that the injunction was necessary to "protect or effectuate" the district court's 1967 judgment which had denied the railroad's application for injunctive relief against the picketing. Significantly, however, the Court went to great lengths to find that the rationale of the 1967 decision was not the same as that subsequently announced in Jacksonville Terminal. Rather, it construed that earlier decision as having been based solely on the district court's belief that under *1309 the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq., it was without jurisdiction to grant the relief sought by the railroad. We think that a fair reading of both the majority and dissenting opinion in Atlantic Coast Lines leads to the conclusion that had the district court's earlier decision adjudicated the union's rights under the Railway Labor Act  as we have here  an injunction to protect that adjudication would have been found by the Court to have been appropriate.
Turning to the facts of the instant case, we think that they present compelling reasons why an injunction against the state court action is appropriate. First, by the defendants' own admission, the state court action presents the identical issues which we have fully adjudicated herein. Thus, because in this court's view our determination here would certainly preclude relitigation in the state forum under the doctrine of res judicata, we can see no purpose which the state court action would serve apart from casting doubt on the finality and force of this court's judgment. We also believe that this concern is particularly compelling where, as here, important federal rights implicating national labor policy are at stake. Moreover, in view of the fact that the Attorney General of New York has a statutory obligation to pursue the remedies set forth in the Taylor Law, see N.Y.Civil Service Law § 211, an assault on these federal rights is a certainty absent an exercise of this court's injunctive powers.
Another consideration is the fact that the entire history of this litigation leads to the conclusion that the defendants have sought to adjudicate this matter in the state court solely because they believe that a different result could be obtained in that forum. See Staten Island Rapid Transit Operating Authority v. International Brotherhood of Electrical Workers, 57 A.D.2d 614, 393 N.Y. S.2d 773 (2d Dep't.), leave to appeal denied, 42 N.Y.2d 804, 397 N.Y.S.2d 1028, 366 N.E.2d 1364, cert. denied, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977). While we are confident that the state court would give full effect to our determination, even the remote possibility of inconsistent judgments in an area of such great importance should be avoided if at all possible. Additionally, we think it important that the present action was commenced some two months prior to the action in state court. This is not a case where the federal plaintiffs have sought to preclude the orderly consideration and determination of an issue already pending before the state court. Rather, it has been the defendants who have sought to forum shop for a more sympathetic ear and who have endeavored to avoid determination of this federal issue in a federal court. Lastly, this court believes that the integrity of the collective bargaining scheme established by the Railway Labor Act requires a prompt and final determination that plaintiff's members have a guaranteed right to engage in self-help. The longer that this issue remains unresolved or that doubts continue to linger, the longer that the federal scheme for resolving railway labor disputes remains nugatory. It is for these reasons and out of no disrespect for the state court's integrity or ability that we take the drastic step of enjoining further state court action affecting the rights of this plaintiff.
Finally, however, because we believe that the issues involved are difficult ones whose resolution are clearly not free from doubt, we think that it would be appropriate to enjoin the plaintiff from engaging in any "self-help" pending the Second Circuit's review of our decision. Such an injunction is clearly necessary to preserve the status quo pending appeal. See Chicago and North Western Railway Co. v. United Transportation Union, 471 F.2d 366, 368 (7th Cir. 1972), cert. denied, 410 U.S. 917, 93 S.Ct. 965, 35 L.Ed.2d 279 (1973). Of course, if the defendants do not prosecute their appeal expeditiously, we would consider vacating this injunction.
NOTES
[1] Defendants sought to file an amended answer on March 4, 1980, the day that the parties appeared to argue plaintiff's motion for summary judgment. As is pertinent here, the proposed amended answer is substantially identical to the one originally filed.
[2] Justice Leviss denied the motion on March 3, 1980.
[3] At that time, the defendants moved to dismiss the action on the ground that the plaintiff had failed to join as an indispensable party the New York State Attorney General. Fed.R. Civ.P. 19. They also moved to stay the instant action pending the outcome of the State proceedings. The court denied both motions from the bench.
[4] SIRTOA also contended, as the defendants do here, that to subject it to the Act's regulatory scheme would be inconsistent with the Supreme Court's holding in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), that the Tenth Amendment prohibits Congress from legislating in a manner which operates to directly displace the States' freedom to structure integral operations in areas of traditional governmental function ...." Id. at 852, 96 S.Ct. at 2474. We rejected this contention as

inconsistent with the Court's own language in Usery which specifically held that the operation of a railroad in interstate commerce is not an integral part of governmental activity and further held that its earlier decisions in United States v. California, [297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936)], and California v. Taylor, [353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957)], were not undermined by Usery. Id. at 854-55 n. 18, 96 S.Ct. at 2475 n. 18. We believe that SIRTOA's operation, even if characterized as a commuter rail service is not akin to such state activities as "fire prevention, police protection, sanitation, public health, and parks and recreation [which] are typical of those performed by state and local governments in discharging their dual functions of administering public law and furnishing public services." Id. at 851, 96 S.Ct. at 2474.
Slip op. at 24-25.
We see no reason why a different conclusion should be reached in the instant case.
[5] We note that there is at least some question as to whether § 2283 is at all applicable to the issue before us since the complaint in this action was filed prior to the commencement of the state court proceedings and prayed for an injunction against their institution. See Dombrowski v. Pfister, 380 U.S. 479, 484 n. 2, 85 S.Ct. 1116, 1119 n. 2, 14 L.Ed.2d 22 (1965). However, because state proceedings are presently pending, we assume that § 2283 does apply. In any event, since we believe that an injunction is authorized under one of the express exceptions to the statute, our analysis of the propriety of issuing such an injunction is identical to that we would engage in if the statute did not come into play.